Anthony Broadman, Bar No. 112417
anthony@galandabroadman.com
Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Seattle, WA 98115-3677
Telephone: (206) 321-2672

Nicole E. Ducheneaux, *Pro Hac Vice*
nducheneaux@bigfirelaw.com
Big Fire Law & Policy Group LLP
1404 Fort Crook Road South
Bellevue, NE 68005-3060
Telephone: (531) 466-8725

Attorneys for Defendant Ho-Chunk, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JOHN H. DOSSETT,<br><br>     Plaintiff,<br><br>v.<br><br>HO-CHUNK, INC., a tribal corporation formed by the Winnebago Tribe of Nebraska, NOBLE SAVAGE MEDIA, L.L.C, a Limited Liability Company of unknown origin, THE NATIONAL CONGRESS OF AMERICAN INDIANS OF THE UNITED STATES AND ALASKA, an Oklahoma Non For Profit Corporation, and HIGH COUNTRY NEWS, a Colorado Nonprofit Corporation,<br><br>     Defendants. | Case No.: 3:19-cv-01386<br><br>**Defendant, Ho-Chunk, Inc.'s**<br>**MOTION TO DISMISS AND MOTION**<br>**TO STRIKE**<br><br>**ORAL ARGUMENT REQUESTED** |

## LR 7-1 CERTIFICATION

In compliance with LR 7-1, the parties have made a good faith effort through personal or telephone conferences to resolve the dispute and have been unable to do so.

## MOTION

COMES NOW Defendant Ho-Chunk, Inc., by and through counsel and moves this court to dismiss the instant Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) based on sovereign immunity from suit. In the alternative, Ho-Chunk, Inc. moves this Court to strike Counts I and V under Oregon anti-SLAPP statute, O.R.S. § 3150 and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1).

Date: November 4, 2019

.

By:     _s/     Nicole E. Ducheneaux_
        Nicole E. Ducheneaux, *Pro Hac Vice*
        Big Fire Law & Policy Group LLP
        1404 Fort Crook Road South
        Bellevue, NE 68005
        Telephone: (531) 466-8725
        Facsimile: (531) 466-8792
        Email: nducheneaux@bigfirelaw.com


By:     _s/ Anthony Broadman_
        Anthony Broadman, Bar No. 112417
        Galanda Broadman PLLC
        8606 35th Avenue NE, Ste. L1
        Seattle, WA 98115
        Telephone: (206) 321-2672
        Fascimile: (206) 299- 7690
        Email: anthony@galandabroadman.com

Anthony Broadman, Bar No. 112417
anthony@galandabroadman.com
Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Seattle, WA 98115-3677
Telephone: (206) 321-2672

Nicole E. Ducheneaux, *Pro Hac Vice*
nducheneaux@bigfirelaw.com
Big Fire Law & Policy Group LLP
1404 Fort Crook Road South
Bellevue, NE 68005-3060
Telephone: (531) 466-8725

Attorneys for Defendant Ho-Chunk, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JOHN H. DOSSETT, | Case No.: 3:19-cv-01386 |
| Plaintiff, | |
| v. | **Defendant, Ho-Chunk, Inc.'s COMBINED MEMORANDUM IN SUPPORT OF MOTION TO DISMISS: AND MOTION TO STRIKE** |
| HO-CHUNK, INC., a tribal corporation formed by the Winnebago Tribe of Nebraska, NOBLE SAVAGE MEDIA, L.L.C, a Limited Liability Company of unknown origin, THE NATIONAL CONGRESS OF AMERICAN INDIANS OF THE UNITED STATES AND ALASKA, an Oklahoma Non For Profit Corporation, and HIGH COUNTRY NEWS, a Colorado Nonprofit Corporation, | |
| Defendants. | |

<u>Table of Contents</u>

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

ARGUMENT ....................................................................................................... 7

I.   Dossett's Suit Is Categorically Barred as HCI Is an Arm of the Winnebago Tribe of Nebraska and Is Cloaked with Tribal Sovereign Immunity from Suit ...................................... 7

   1.   Legal Standard for Arm-of-the-Tribe Immunity .......................................... 7

   2.   Ho-Chunk, Inc. and Indianz.com Company Are Protected from Suit by Tribal Sovereign Immunity ............................................................................ 12

      a.   The Breakthrough Arm-of-the-Tribe Test ............................................ 12

      b.   Ho-Chunk, Inc. and Indianz.com Company are Arms of the Winnebago Tribe .... 13

         i.   Ho-Chunk, Inc. and the Indianz.com Company Were Created under Winnebago Tribal Law ........................................................................ 13

         ii.   Ho-Chunk, Inc. and Indianz.com Company Exist for the Purpose of Increasing Economic Development on the Winnebago Tribe of Nebraska's Reservation ........... 14

         iii.   Ho-Chunk, Inc. and the Indianz.com Company Are Controlled by the Winnebago Tribe of Nebraska .................................................................. 16

         iv.   The Winnebago Tribe of Nebraska Explicitly Shared Its Sovereign Immunity with Ho-Chunk, Inc. and Indianz.com Company ........................................ 18

         v.   Ho-Chunk, Inc. and Indianz.com Company Provide Invaluable Financial Support to the Winnebago Tribe of Nebraska .......................................... 19

II.   Dossett's Defamation Claim and Intentional Interference with Economic Relations Claims Must be Struck Pursuant to Oregon's Anti-SLAPP Statute and Fed.R. Civ. P. 8 and 12(b)(6) Standards ........................................................................................ 20

   1.   Legal Standard: The Anti-SLAPP Statute Applies to Both the Defamation and the Intentional Interference with Economic Relations Claims ............................. 20

      a.   Oregon's Anti-SLAPP Statute Provides Broad Protections for First Amendment Activity ....................................................................................... 21

   2.   DOSSETT CANNOT ESTABLISH A PROBABILITY OF PREVAILING ON THE DEFAMATION CLAIMS ........................................................................ 23

      a.   The Allegedly Defamatory Content is Either Protected or Privileged Speech ....... 23

      b.   Dossett Is a Public Figure .................................................................. 23

      c.   Oregon's Standard for Defamation Claims ............................................. 25

      d.   Dossett's Claims Are Legally Insufficient to Prove Actual Malice ................. 25

e.    Both the articles and comments alleged by Dossett to be defamatory are constitutionally protected speech under the First Amendment ........................................ 27

   i.    The August 31st Article ........................................................................ 28

   ii.    The October 23rd Article ................................................................ 30

f.    The Remainder of the Allegedly Defamatory Comments Are True ......................... 32

3.    Dossett Cannot Establish a Probability of Prevailing on the Intentional Interference with Economic Relations Claim ........................................................................ 33

   a.    Dossett's Allegations Are Insufficient to Make a Prima Facie Case..................... 33

CONCLUSION ............................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amerind Risk Mgmt. Corp. v. Malaterre*,
    633 F.3d 680 (8th Cir. 2011) ................................................................8

*Ashcroft v. Iqbal*,
    556 U.S. 662, 686-87 (2009) ........................................................26, 34

*Bank of Or. v. Indep. News, Inc.*,
    298 Or. 434 (1985)..........................................................................33

*Barry v. Time, Inc.*,
    584 F. Supp. 1110 (N.D. Cal. 1984) ...................................................31

*Basso v. Utah Power & Light Co.*,
    495 F.2d 906 (10th Cir. 1974) ............................................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................34

*Blatchford v. Native Village of Noatak*,
    501 U.S. 775, 782 (1991)..................................................................10

*Bodi v. Shingle Springs Band of Miwok Indians*,
    832 F.3d 1011, 1020 (9th Cir. 2016) ..............................................10, 11

*Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*,
    629 F.3d 1173 (10th Cir. 2010) ................................................... *passim*

*Byrnes v. Lockheed-Martin, Inc.*,
    No. C-04-03941, 2005 WL 3555701 (N.D. Cal. Dec. 28, 2005), *aff'd and*
    *remanded*, 257 Fed. Appx. 34 (9th Cir. 2007)...............................27, 30

*C&L Enter., Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.*,
    532 U.S. 411 (2001)..........................................................................7

*United States ex rel. Cain v. Salish Kootenai College*,
    862 F.3d 939 (9th Cir. 2017) ....................................................9, 10, 11

*Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe*,
    474 U.S. 9 (1985)..............................................................................8

*Chemehuevi Indian Tribe v. Cal. State Bd. of Equalization*,
    757 F.2d 1047 (9th Cir. 1985) ............................................................8

*Cobell v Norton*,
283 F. Supp. 2d 66 (D. D.C. 2003) ......................................................................23

*Coliniatis v. Dimas*,
965 F. Supp. 511 (S.D. N.Y. 1997) ......................................................................32

*Contour Spa at the Hard Rock, Inc. v. Seminole Tribe of Fla.*,
692 F.3d 1200 (11th Cir. 2012) ....................................................................10, 11

*Edwards v. Nat'l Audubon Soc., Inc.*,
556 F.2d 113 (2d Cir. 1977).................................................................................31

*Edwards v. New York Times Co.*,
434 U.S. 1002 (1977)...........................................................................................31

*Elizabeth Retail Props. LLC v. KeyBank Nat'l Ass'n*,
83 F. Supp. 972 (D. Or. 2015) .............................................................................25

*Fairbanks v. Roller*,
314 F. Supp. 3d 85 (D.D.C. 2018) .................................................................24, 25

*Gardner v. Martino*,
563 F.3d 981 (9th Cir. 2009) ........................................................................ *passim*

*Garrison v. Louisiana*,
379 U.S. 64, 74 (1964)........................................................................................26

*Grimstaud v. Knudsen*,
386 P.3d 649 (Or. App. 2016)..............................................................................33

*Hoover v. Kiowa Tribe of Okla.*,
909 P.2d 59 (Okla. 1995) *cert. denied*, 517 U.S. 118 (1996) ...................................9

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988)........................................................................................25, 26

*Hutto v. S.C. Retirement Sys.*,
773 F.3d 536, 543 (4th Cir. 2014) ....................................................................9, 11

*Idaho v. Coeur d'Alene Tribe of Idaho*,
521 U.S. 261 (1997)............................................................................................10

*Kiowa Tribe of Okla. v. Mfr'ing Techs., Inc.*,
523 U.S. 751 (1998)...............................................................................9, 10, 11

*Leidholdt v. L.F.P. Inc.*,
860 F.2d 890, 892 (9th Cir. 1988) .......................................................................24

*Manzari v. Associated Newspapers Ltd.*,
   830 F.3d 881 (9th Cir. 2016) ...................................................22, 24, 25

*McClanahan v. State Tax Comm'n of Ariz.*,
   411 U.S. 164, 173 (1973) ...................................................................10

*McGanty v. Staudenraus*,
   901 P.2d 841 (Or. 1995) ....................................................................33

*Metabolife Intern., Inc. v. Wornick*,
   264 F.3d 832 (9th Cir. 2001) ............................................................21

*Michel v. NYP Holdings, Inc.*,
   816 F.3d 686 (11th Cir. 2016) ..........................................................26

*Michigan v. Bay Mills Indian Cmty.*,
   572 U.S. 782 (2014) ...................................................................5, 7, 12

*Milkovich v. Lorian Journal Co.*,
   497 U.S. 1 (1990) ...............................................................................27

*Miller v. Watson*,
   No. 3:18-cv-00562-SB, 2019 WL 1871011 (D. Or. Feb. 12, 2019)
   (Beckerman, Mag.) ..................................................................21, 22, 26

*Miller v. Wright*,
   705 F.3d 919, 923 (9th Cir. 2013) ..................................................8, 12

*Mullen v. Meredith Corp.*,
   271 Or. App. 698 (2015) ...................................................................22

*Neumann v. Liles*,
   369 P.3d 1117 (Or. 2016) ..................................................................25

*New York Times v. Sullivan*,
   376 U.S. 254 (1964) ...........................................................................25

*Northwest Nat. Gas Co. v. Chase Gardens, Inc.*,
   982 P.2d 1117 (Or. 1999) ..................................................................33

*Page v. Parsons*,
   249 Or.App. 445, 461, 277 P.3d 609 (2012) ....................................21

*Parsi v. Daioleslam*,
   595 F. Supp. 2d 99 (D.D.C. 2009) ...............................................24, 25

*Partington v. Bugliosi*,
   56 F.3d 1147, 1153 (9th Cir. 1995) ..................................................28

*People v. Miami Nation Enters.*,
376 P.3d 357 (Cal. 2014) ................................................................12

*Pistor v. Garcia*,
791 F.3d 1104 (9th Cir. 2015) ................................................8, 11, 12

*Planned Parenthood Fed'n of America, Inc. v. Ctr. for Medical Progress*,
890 F.3d 828 (2018)................................................................21, 27

*Plotkin v. State Accident Ins. Fund*,
280 Or. App. 812 (2016)................................................................22

*Plotkin v. State Accident Ins. Fund*,
385 P.3d 1167 (Or. App. 2016)................................................................33

*Price v. Viking Penguin, Inc.*,
881 F.2d 1426 (8th Cir. 1989) ................................................................32

*Puyallup Tribe, Inc. v. Dep't of Game*,
433 U.S. 165, 175 (1977)................................................................8

*Reesman v. Highfill*,
327 Or. 597 (1998)................................................................27

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
302 F. Supp. 3d 1005 (N.D. Cal. 2017) ................................................................26

*Robinson v. United States*,
586 F.3d 683, 685 (9th Cir. 2009) ................................................................12

*Sanford v. Hampton Res., Inc.*,
298 Or. App. 555 (2019)................................................................33

*Santa Clara Pueblo v. Martinez*,
436 U.S. 49, 58 (1978)................................................................7, 10

*St. Amant v. Thompson*,
390 U.S. 272, 730-31 (1968) ................................................................26

*Staten v. Steel*,
222 Or. App. 17 (2008), *rev. denied*, 345 Or. 618 (2009) ................................................................21

*Sunshine Sportswear & Electronics, Inc. v. WSOC Television, Inc.*,
738 F. Supp. 1499 (D.S.C. 1989)................................................................32

*Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g*,
476 U.S. 877, 890 (1986)................................................................7, 10, 11

*U.S. Fid. & Guar. Co.*, 309 U.S. 506, 513 (1940) ........................................................10

*Unelko Corp. v. Rooney*,
    912 F.2d 1049, 1058 (9th Cir. 1990) ................................................................34

*United States v. Sioux Nation*,
    448 U.S. 371 (1980)............................................................................................1

*United States v. U.S. Fid. & Guar. Co.*,
    309 U.S. 506, 512 (1940)....................................................................................8

*In re Whitaker*,
    474 B.R. 687 (8th Cir. 2012) ................................................................. *passim*

*White v. Univ. of Cal.*,
    765 F.3d 1010 (2014)............................................................. *passim*

*Williams v. Big Picture Loans, LLC.*
    929 F.3d 170 (4th Cir. 2019) ................................................. *passim*

*Young v. Davis*,
    259 Or. App. 497 (2013)................................................................21, 22

**Statutes**

18 U.S.C. § 1151................................................................................................................1

Indian Gaming Regulatory Act, 25 U.S.C. § 2701 ........................................................4, 5

Native American Business Development, Trade Promotion, and Tourism Act, 25
    U.S.C. §§ 4301..............................................................................................5

O.R.S § 31.150 to 31.155................................................................................21, 22, 23

Winnebago Corporations Code Title 11, Article 10 ......................................................15

**Other Authorities**

*The American Indian and Alaska Native Population: 2010*, 2010 CENSUS,
    https://www.census.gov/history/pdf/c2010br-10.pdf .......................................1, 35

*2019 Free Press Investigative Awards*,
    https://najanewsroom.com/2019/06/21/naja-announces-recipients-of-2019-
    free-press-investigative-awards/ ........................................................................6

Ho-Chunk, Inc., *Profile, Lance Morgan*,
    https://hochunkinc.com/management_LM.php ......................................................5

*Indian Country Demographics*, http://www.ncai.org/about-tribes/demographics ..........................1

NCAI, *Violence Against Women*, http://www.ncai.org/policy-issues/tribal-
governance/public-safety-and-justice/violence-against-women.................................................1

*Research Policy Update: Violence Against American Indian and Alaska Native
Women*, February 2018, http://www.ncai.org/policy-research-center/research-
data/prc-publications/VAWA_Data_Brief__FINAL_2_1_2018.pdf .......................................2

# INTRODUCTION

"Indian Country,"[1] as it is used colloquially by Native Americans, is a term used to refer to the broad, inter-tribal, community of American Indians across the nation. While the geographic scope of Indian Country is vast, encompassing the entire United States, it is a relatively small, insular community. According to the 2010 U.S. Census, only 2.9 million people identified as American Indian or Alaska Native, representing about .09 percent of the United States population. *See*, United States Census Bureau, *The American Indian and Alaska Native Population: 2010*, 2010 CENSUS, https://www.census.gov/history/pdf/c2010br-10.pdf (last accessed Oct. 15, 2019).

Indian Country is a beautiful place, but it can also be a troubled place. The history of the United States is one marked with the indelible stain of the "ripe . . .[,] rank[,] and dishonorable dealings" perpetrated by the United States that robbed this continent's original inhabitants of their homelands, their culture, their prosperity, and their way of life. *See*, *United States v. Sioux Nation*, 448 U.S. 371, 388 (1980). As a result, American Indians today suffer from higher rates of poverty, suicide, and alcoholism than any other population. *See*, *e.g.*, National Congress of American Indians ("NCAI"), *Indian Country Demographics*, http://www.ncai.org/about-tribes/demographics (last accessed Oct. 15, 2019). Importantly, Indian women are especially vulnerable. Rates of violence against Native women greatly exceed that of any other population in the United States. According to studies, 34 percent of Native women will be raped in their lifetimes and 39 percent will be victims of domestic violence. NCAI, *Violence Against Women*, http://www.ncai.org/policy-issues/tribal-governance/public-safety-and-justice/violence-against-women (last accessed Oct. 15, 2019). Most sexual and violent predators against Native women

---

[1] "Indian Country," is also a term of art defined at 18 U.S.C. § 1151 in the context of criminal jurisdiction. This Memorandum of Law uses the term colloquially and not in the criminal-legal sense.

are non-Native. NCAI Policy Research Center, *Research Policy Update: Violence Against American Indian and Alaska Native Women*, February 2018, http://www.ncai.org/policy-research-center/research-data/prc-publications/VAWA_Data_Brief__FINAL_2_1_2018.pdf (last accessed Oct. 15, 2019). Sexual and violent victimization of Native women is a crisis in Indian Country.

Mainstream America has been slow to acknowledge the modern-day problems of American Indians. Indian Country itself historically has lacked the political power, the economic power, and the media presence to raise Indian issues to the forefront of the national consciousness. Indian Country, however, has been working hard over the past 75 years to create institutions within Indian Country to build its own political power, economic power, and the voice to make change. The result of that hard work has been the rise of the defendants in the instant lawsuit. NCAI has been Indian Country's most powerful advocate for 75 years. Ho-Chunk, Inc. is among the most prominent drivers of Indian Country economic development in the nation. And Indianz.com has acted as primary news source for the important issues that affect this vulnerable community.

To the uninitiated, the present dispute concerning the allegations against John Dossett could appear to be petty, gossipy, and unfair to a private person. In the small, insular world of Indian Country, however, the allegations against Dossett was significant news of profound import. In Indian Country, Dossett is – as his Complaint boasts – a big person. He was the very visible, general counsel to the nation's leading Indian Country advocate, renowned for its powerful campaign to combat violence against Native women. When reports that NCAI's top attorney, a non-Indian, had potentially victimized a Native woman, it was indisputably newsworthy at a time when the #MeToo movement was at its apex.

However, concerned citizens of the Native community were not going to see this issue in the pages of the New York Times or the Washington Post. It was therefore incumbent upon Native

journalists to investigate and report on this issue by reviewing documents, interviewing sources, and reporting on the public statements of NCAI officials. This was precisely what Indianz.com did, in the exercise of its Constitutionally-guaranteed First Amendment rights and in service to the Indian community – a community that has only recently gained a voice in the press.

Dossett's lawsuit against HCI and Indianz.com, therefore, is much more than just a self-serving attempt to exonerate John Dossett in the court of public opinion. It is an attack on the free Native press, which has fought so hard even to exist. To add insult to injury, he has brought his claims against Ho Chunk, Inc. – a premier tribal economic development corporation. Ho Chunk, Inc. not only dedicates itself to serving Indian Country, but it is wholly owned by the Winnebago Tribe of Nebraska ("Tribe") and exists to raise revenue for critical Tribal governmental and social programs. Significantly, as an arm of a federally recognized Tribe, HCI is cloaked with tribal sovereign immunity from suit, as Dossett well knows. For these reasons, and as set forth in detail below, Dossett's claims against HCI and Indianz.com must be dismissed.

## FACTUAL BACKGROUND

The Winnebago Tribe of Nebraska has struggled with profound poverty since the United States forcibly removed the Winnebago people from their woodlands homeland in the 19th century and segregated them on their present-day Reservation in northeast Nebraska, robbing them of their traditional way of life. Declaration of John Snowball ("Snowball Decl.") at ¶ 5. The Winnebago people continued to struggle throughout most of the 20th century until the emergence of Indian gaming in early 1990s. The Tribe opened a casino on tribal land in nearby Iowa in 1992 and experienced early success. Snowball Decl. at ¶ 6. However, in 1994, the state of Iowa expanded gaming into the Tribe's market and the Tribe realized that gaming would not be a long-term solution to its overall goal of prosperity. Consequently, the Tribe formed Ho-Chunk, Inc. in 1994

in order to diversify the Tribe's investments away from gaming. Declaration of Lance G. Morgan ("Morgan Decl.") at ¶ 3. The Tribe's goal was to develop an entrepreneurial company that was able to recognize and develop a broad range of economic opportunities. Snowball Decl. at ¶ 6.

HCI is wholly owned by the Winnebago Tribe of Nebraska. Snowball Decl. at Exhibits ("Ex") 4. It is controlled by a Board of Directors comprised of Tribal members and elected Tribal officials who have been appointed by the Tribal Council. Declaration of Lance Morgan ("Morgan Decl.") at ¶ 7. Two of HCI's four top executives, including its CEO are enrolled Tribal members. The Tribal Council maintains ultimate authority over both the Board of Directors and HCI's management. *See* Snowball Decl. at ¶ 10-13.

Over the past 25 years, HCI has become one of the premier tribal economic development corporations in the nation. In 1995, HCI had revenue totaling $183,301 with $33,497 in net income. Snowball Decl. at ¶ 18. At the end of 2018, HCI enjoyed $259 million in revenue, with $9.6 million net income. *Id*. HCI currently employs over 1000 people, including numerous Tribal members, all over the world. *Id* at ¶ 16. While HCI reinvests some of its profits, HCI contributes a significant portion of its income back to the Tribe itself and profoundly has raised the standard of living for the Winnebago people. Snowball Decl. at Ex. 5. Over its lifetime, HCI has contributed more than $181 million back to the Winnebago Tribe to support basic functions of tribal government, social programs, cultural programs, education, housing, and other activities that have raised the standard of living and quality of life of the Winnebago people. *Id*.

HCI's economic success is precisely in line with modern federal policy that has encouraged a shift away from tribal dependency on the federal government and toward self-sufficiency and self-determination, including tribal participation in modern mainstream commerce to generate revenue that supports tribal governments. *See*, *e.g.*, 25 U.S.C. § 2701 (declaring the policy of the

Indian Gaming Regulatory Act to promote "tribal economic development, self-sufficiency, and strong tribal governments"); Native American Business Development, Trade Promotion, and Tourism Act, 25 U.S.C. §§ 4301 et seq. (encouraging tribal economies to interact with the private market for economic development). As Justice Sotomayor commented in *Michigan v. Bay Mills Indian Community*, "Tribes face a number of barriers to raising revenue in traditional ways. If Tribes are ever to become more self-sufficient, and fund a more substantial portion of their own governmental functions, commercial enterprises will likely be a central means of achieving that goal." 570 U.S. 782, 806 (2014) (Sotomayor, J. concurring).

For that reason, HCI has been recognized by numerous private and governmental organizations for its success in tribal economic development: HCI has received the Innovations in Government Award, sponsored by Harvard University and the Ford Foundation; HCI received the Honoring Nations Award, also sponsored by Harvard University; HCI received the Entrepreneurial Spirit Award from Minority Business Magazine; and HCI has been recognized by the Small Business Administration, the U.S. Department of State, the U.S Department of Commerce, and the White House. HCI's CEO, Lance Morgan, was also selected as a "Champion of Change" by the White House in 2011 for his work with HCI. Ho-Chunk, Inc., *Profile*, *Lance Morgan*, https://hochunkinc.com/management_LM.php (last accessed Oct. 15, 2019).

Indianz.com is a tradename and domain name wholly owned by the Winnebago Tribe of Nebraska. It is currently operated by HCI through a subsidiary called Indianz.com Company. Morgan Decl. at ¶ 10. Both HCI and Indianz.com Company are wholly owned by the Tribe and organized under Tribal law. "In 2002, AllNative.com Company, a wholly owned subsidiary of HCI, formed an LLC with Noble Savage Media, LLC, an individually owned entity that contributed all ownership rights in Indianz.com, Indianz.net, and Indianz.org, or any other Indianz

identifier for their capital contribution." Morgan Decl. at ¶ 12. This LLC was organized under Nebraska law and named AllNative & Indianz, LLC. *Id*. In 2009, Noble Savage, LLC withdrew from AllNative & Indianz, LLC. *Id*. On December 8, 2011, AllNative.com Company operated Indianz.com until 2011 when HCI organized Indianz.com Company pursuant to the Corporation Code of the Winnebago Tribe of Nebraska for purposes of operating Indianz.com. Morgan Decl. at ¶ 15. Indianz.com Company has operated Indianz.com since that time. The Winnebago Tribe owns Indianz.com, its domain name, and its content. Morgan Decl. at ¶ 10.

Indianz.com is one of Indian Country's primary news sources. It reports on legal, social, environmental, cultural, and entertainment issues. Declaration of Acee Agoyo ("Agoyo Decl.") at ¶ 2. In 2019, the authors of the articles at issue in this lawsuit received the 2019 Richard LaCourse Award from the Native American Journalists Association, honoring Indian Country journalists for investigative reporting. Specifically, Indianz.com's Acee Agoyo and Kevin Abourezk were honored for their work in "exposing the sexual harassment allegations within the National Congress of American Indians . . ." Native American Journalists Association, *NAJA Announces Recipients of 2019 Free Press Investigative Awards*, https://najanewsroom.com/2019/06/21/naja-announces-recipients-of-2019-free-press-investigative-awards/ (last accessed Oct. 15, 2019).

This reporting was contained in the two 2018 articles that are the subject of Dossett's claims in the instant matter. Indianz.com published the first article on August 31, 2019, entitled "Prominent Indian Country Attorney Reassigned After #MeToo Allegations". ECF 1-1. Indianz.com published the second article on October 23, 2018, entitled "National Congress of American Indians opens annual convention amid controversy". ECF 1-5. NCAI, including its personnel and internal workings, are a regular subject of Indianz.com's reporting in light of the

critical importance of NCAI to Indian Country.  Likewise, Indianz.com's journalists attend and

report on NCAI's annual meeting every year.  Agoyo Decl. at ¶ 9.

## ARGUMENT

Dossett's Complaint makes two claims against HCI: (1) that the August 31 Article and the

October 23 Article were defamatory; and (2) that HCI intentionally interfered with Dossett's

economic relations with NCAI, Lewis & Clark Law School, and Cornell University.  As set forth

in detail herein, Dossett's claims against HCI must be dismissed in their entirety under Federal

Rule of Procedure 12(b)(1) as HCI is an arm of the Winnebago Tribe of Nebraska and is cloaked

in the Tribe's immunity such that this Court lacks jurisdiction.  In the alternative, both Dossett's

defamation claim and his intentional interference with economic relations claim should be

dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) as he has failed to state a claim.

I.      **Dossett's Suit Is Categorically Barred as HCI and Indianz.com Company Are Arms
         of the Winnebago Tribe of Nebraska and Cloaked with Tribal Sovereign Immunity
         from Suit**

         1.  **Legal Standard for Arm-of-the-Tribe Immunity**

At issue in this matter is nothing less than what the U.S. Supreme Court has called "[a]mong

the core aspects of sovereignty that tribes possess," which is "the common-law immunity from suit

traditionally enjoyed by sovereign powers."  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782,

2030 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) (internal quotations

omitted).  This immunity "is a necessary corollary to Indian sovereignty and self-governance."  *Id.*

(quoting *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877,

890 (1986).  Absent a clear and unequivocally expressed waiver of sovereign immunity, Indian

tribes are not subject to suit in any forum.  *C&L Enter., Inc. v. Citizen Band of Potawatomi Indian

Tribe of Okla.*, 532 U.S. 411, 418 (2001).  Furthermore, "[t]ribal sovereign immunity not only

protects tribes themselves, but also extends to arms of the tribe acting on behalf of the tribe." *White v. Univ. of Cal.*, 765 F.3d 1010, 1025 (2014). This is clear where, as here, the entity was created pursuant to tribal law, with a purpose to benefit the tribe, is subject to ultimate tribal control, and the tribe has intended to imbue the entity with its immunity. *See id.; see also Williams v. Big Picture Loans, LLC.* 929 F.3d 170, 177 (4th Cir. 2019); *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010).

Tribal sovereign immunity from suit constitutes a threshold jurisdictional question that is appropriately addressed in a motion to dismiss. *Chemehuevi Indian Tribe v. Cal. State Bd. of Equalization*, 757 F.2d 1047, 1051 (9th Cir. 1985) (citing *Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 175 (1977); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512 (1940)), *rev'd on other grounds sub nom. Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9 (1985). It well established in this Circuit and others that when jurisdiction is challenged in a motion to dismiss pursuant to Federal Rule of Civil Procedure 12 (b)(1) asserting tribal sovereign immunity from suit, the party asserting subject matter jurisdiction bears the burden of proving its existence. *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015); *Miller v. Wright*, 705 F.3d 919, 923 (9th Cir. 2013); *accord Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 685 (8th Cir. 2011); *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). Further, "[w]hen a district court is presented with a challenge to its subject matter jurisdiction, no presumptive truthfulness attaches to a plaintiff's allegations" and the court may consider evidence proving lack of jurisdiction. *Pistor*, 791 F.3d at 1111 (internal citations and punctuation omitted).

While the general rule regarding a plaintiff's burden to prove jurisdiction is clear, the Ninth Circuit has not directly considered which party bears the burden in the context of arm-of-the-tribe immunity. *See, e.g.*, *White*, 765 F.3d 1010. Significantly, the Tenth Circuit, which originated the

controlling arm-of-the-tribe test, has suggested that the general rule applies: the burden must be borne by the party asserting jurisdiction. *See, Breakthrough*, 629 F.3d at 1189 n. 11 (imposing the burden of proving entitlement to jurisdictional discovery on the party asserting jurisdiction). The Fourth Circuit, on the other hand, recently ruled that the arm-of-the-tribe itself bears the burden of proving entitlement to immunity. *Williams*, 929 F.3d at 176-77. *Williams* reached this conclusion by importing its reasoning from a Fourth Circuit "arm-of-the-state" case, which imposed the burden on the party asserting immunity because "sovereign immunity is 'akin to an affirmative defense. . . .'" *Id.* at 176 (quoting *Hutto v. S.C. Retirement Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)). Without citing any controlling Supreme Court principles and with almost no analysis, *Williams* explained that importing the "arm-of-the-state" burden was appropriate because it gave "proper recognition to the similarities between state sovereign immunity and tribal sovereign immunity." *Id.*

The Fourth Circuit's reasoning is in direct conflict with clear Ninth Circuit authority. First, the Ninth Circuit emphatically has rejected the use of state immunity as a guidepost for tribal sovereign immunity principles. *United States ex rel. Cain v. Salish Kootenai College* considered the appropriate arm-of-the-tribe test for determining whether a tribal entity constituted a "person" under a federal statute. 862 F.3d 939 (9th Cir. 2017). Plaintiffs in *Cain* urged adoption of a state sovereign immunity test for this purpose instead of the arm-of-the-tribe test articulated by *White v. University of California*. Relying on controlling U.S. Supreme Court principles,[2] the Court disagreed:

---

[2] The *Cain* court specifically relied upon the U.S. Supreme Court's analysis in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, in which the Court was urged to restrict tribal sovereign immunity to on-reservation transactions and to governmental activities, in part, by importing state immunity concepts that define extra-territorial state immunity as the product of comity, not any more fundamental legal principle. 523 U.S. 751, 756 (1998) (citing *Hoover v.*

It may seem somewhat arbitrary to apply different tests for determining whether an entity is an arm of a state than for determining whether an entity is an arm of a tribe. But this is the product of our unusual history. Our country has two different types of domestic sovereigns: States and Indian tribes. While they are both sovereigns, their respective sovereign immunities differ in scope. Unlike States, Indian tribes were not at the Constitutional Convention and the Eleventh Amendment doesn't apply to the them. To determine the reach of tribal immunity using Eleventh Amendment case law would be anachronistic.

*Cain*, 862 F.3d at 944-45 (citing *Kiowa Tribe of Okla. v. Mfr'ing Techs., Inc.*, 523 U.S. 751,

(1998)). *Cain* is consistent with the Ninth Circuit's decision in *Bodi v. Shingle Springs Band of*

*Miwok Indians* in which the court was urged to adopt state immunity principles to govern waivers

of tribal sovereign immunity. The Court refused, again based on controlling Supreme Court

precedent,[3] explaining that "[t]ribal immunity is not synonymous with a State's Eleventh

Amendment immunity, and parallels between the two are of limited utility." 832 F.3d 1011, 1020

(9th Cir. 2016) (citing *Wold*, 476 U.S. at 890). The Ninth Circuit's staunch refusal to restrict tribal

sovereign immunity by comparison to state immunity is also in accord with the Eleventh Circuit's

approach. In *Contour Spa at the Hard Rock, Inc. v. Seminole Tribe of Fla.*, 692 F.3d 1200 (11th

---

*Kiowa Tribe of Okla.*, 909 P.2d 59 (Okla. 1995) *cert. denied*, 517 U.S. 118 (1996). The Court refused to draw the comparison between state and tribal immunity as "the immunity possessed by Indian tribes is not coextensive with the States. [We have] have distinguished state sovereign immunity from tribal sovereign immunity, as tribes were not parties to the mutuality of concession that makes the States' surrender of immunity from suit by sister States plausible." *Kiowa*, 532 U.S. at 756 (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 782 (1991)) (internal punctuation and citations omitted); *accord Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268-69 (1997).

[3] The *Bodi* court relied on *Wold*, a landmark sovereign immunity case in which the Court affirmed the powerful, fundamental nature of tribal sovereign immunity from suit; and in which the Court rejected notions that tribal immunity could be restricted by interaction with the state sovereign. *Wold*, 476 U.S. 877. In so holding, the Court emphasized the unique and independent origins of tribal sovereign immunity: "The common law sovereign immunity possessed by tribes is a necessary corollary to Indian sovereignty and self-governance. . . . Of course, because of the peculiar 'quasi-sovereign' status of the Indian tribes, the Tribe's immunity is not congruent with that which the Federal Government, or the States enjoy." *Id.* at 890 (citing *Santa Clara*, 436 U.S. 49; *U.S. Fid. & Guar. Co.*, 309 U.S. 506, 513 (1940); *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 173 (1973)).

Cir. 2012), the court considered whether state immunity waiver principles should apply to tribal immunity, and concluded: "Simply put, an Indian tribe's sovereign immunity is not the same thing as a state's Eleventh Amendment immunity.") *Id.* at 1206 (citing *Wold*, 476 U.S. at 890)). Like the Ninth Circuit, the Eleventh Circuit relied on controlling Supreme Court authority,[4] which dictates that "there are powerful reasons to treat an Indian tribe's sovereign immunity differently from a state's Eleventh Amendment Immunity." *Id.*

The Fourth Circuit's summary conclusion that imposing the burden on the arm of the tribe was appropriate because it affords "proper recognition to the similarities between state sovereign immunity and tribal sovereign immunity" was therefore in error and inconsistent with Ninth Circuit and Supreme Court authority. *Williams*, 929 F.3d at 176.

*Williams*'s second basis for imposing the burden on the arm of the tribe is likewise in direct conflict with this Circuit. Citing its arm-of-the-state authority, *Williams* reasoned that "[p]lacing the burden of proof on the defendant entity aligns with our reasoning in *Hutto* that sovereign immunity is 'akin to an affirmative defense. . . .'" *Williams*, 929 F.3d at 176. In *Pistor v. Garcia*, the Ninth Circuit directly considered the question of where the burden should fall when a defendant files a motion to dismiss under Rule 12(b)(1) based tribal sovereign immunity from suit. Importantly. *Pistor* agreed with the party challenging tribal sovereign immunity that "[s]overiegn immunity's quasi-jurisdictional nature . . . means that it may be forfeited where the sovereign fails to assert it and therefore may be viewed as an affirmative defense." *Pistor*, 791 F.3d at 1111. Nevertheless, the Court held that "[a]lthough sovereign immunity is only quasi-jurisdictional in nature, Federal Rule of Civil Procedure 12(b)(1) is still a proper vehicle for invoking sovereign

---

[4] Like *Cain* and *Bodi*, *Contour Spa* relied on the Court's seminal tribal sovereign immunity cases: *Wold*, 476 U.S. at 890-91 and *Kiowa*, 523 U.S. at 756.

immunity from suit. . . ," and therefore "'the party asserting subject matter jurisdiction has the burden of proving its existence,' i.e. that immunity does not bar the suit." *Id.* (citing *Miller*, 705 F.3d at 923). *Pistor* confirmed that, although the burden is on the party asserting jurisdiction, the analysis is not a presumption in favor of immunity. *See, Pistor*, 791 F.3d at 1111. Instead, "a district court may hear evidence regarding jurisdiction and resolve factual disputes where necessary." *Id.* (quoting *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009)).

In the Ninth Circuit, therefore, where defendants have filed a motion to dismiss under Rule 12(b)(1) asserting arm-of-the-tribe immunity, the burden remains on the party asserting jurisdiction to prove that such jurisdiction exists.[5] Notwithstanding where this Court places the burden, however, there is no question that HCI is an arm of the Winnebago Tribe of Nebraska cloaked in its sovereign immunity.

## 2. Ho-Chunk, Inc. and Indianz.com Company Are Protected from Suit by Tribal Sovereign Immunity

### a. The Breakthrough *Arm-of-the-Tribe Test*

Whether an entity constitutes an arm of the tribe for purposes of determining that it is entitled to tribal sovereign immunity from suit is governed by the factors set forth in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, which has been followed by every circuit court to consider arm-of-the-tribe immunity since. 629 F.3d 1173 (10th Cir. 2010); *see also Williams*, 929 F.3d at 177; *White*, 765 F.3d at 1025; *In re Whitaker*, 474 B.R. 687, 696 (8th Cir.

---

[5] State court authorities are inapposite. The California Supreme Court's assignment of the burden to the arm of the tribe in *People v. Miami Nation Enters.*, 376 P.3d 357, 368 (Cal. 2014) is based on arm-of-the-state authorities and inconsistent with Ninth Circuit precedent. Further, it is axiomatic that "tribal immunity is a matter of federal law and is not subject to diminution by the States," even state courts. *See Bay Mills*, 572 U.S. at 788.

2012). Under *Breakthrough*, an entity is entitled to tribal sovereign immunity from suit if the following factors demonstrate that it is an arm of the tribe:

> (1) the method of the entities' creation; (2) their purpose; (3) their structure, ownership, and management; (4) the tribe's intent to share its sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) the policies underlying tribal sovereign immunity and the entities' connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities.

929 F.3d at 177 (internal quotation marks omitted). The Ninth Circuit has declined to adopt the sixth factor as a separate factor, instead choosing to apply it as an overarching requirement throughout the entire analysis. *White*, 765 F.3d at 1025; *accord Williams*, 929 F.3d at 177.

### b.  Ho-Chunk, Inc. and Indianz.com Company are Arms of the Winnebago Tribe

#### i.  Ho-Chunk, Inc. and the Indianz.com Company Were Created under Winnebago Tribal Law

Pursuant to the controlling arm-of-the-tribe test, the first factor weighs "in favor of immunity" if the entity was formed under tribal law. *Williams*, 929 F.3d at 177-78 ].   In *Breakthrough* and *Williams*, the Tenth Circuit and the Fourth Circuits both found that the entity in question was created under tribal law as the tribe created the entity via tribal resolution and the entity operated pursuant to a tribal ordinance.  *Breakthrough*, 629 F.3d at 1191-92; *Williams*, 929 F.3d at 177; *see also White*, 765 F.3d at 1025 (relying on resolution only); *Whitaker*, 474 B.R. at 697 (same).

 In the instant matter, the first *Breakthrough* factor weighs plainly in favor of immunity. HCI is a corporation organized by the passage of a Tribal resolution pursuant to the Winnebago Tribal Council's authority under Article IV, Section 1(o) of the Winnebago Constitution, which empowers the Tribal Council to "charter subordinate organizations for economic or political purposes and to regulate the activities of cooperative associations," and pursuant to the Tribe's

Business Corporation Code, which grants the Tribal Council the power to "charter a corporation which is wholly owned by the Winnebago Tribe of Nebraska." Snowball Decl. at ¶ 7-8 Ex. 5, 11-3. HCI likewise created Indianz.com Company ("Company") pursuant to the Tribal Corporation Code, which empowers HCI to create subsidiaries that are corporations "indirectly owned by the Tribe." Snowball Decl. at Ex. 3. The Company's Articles of Incorporation further reiterate that "[t]he Winnebago Tribe of Nebraska . . .[,] acting through the Winnebago Tribal Council, hereby authorizes these Articles of Incorporation to be filed under the Winnebago Tribe of Nebraska, Title 11, Business Corporation Code, for the purpose of creating the tribal corporation described herein." Morgan Decl. at Ex. 3. HCI and the Company were created unequivocally under Winnebago Tribal law.

### ii. Ho-Chunk, Inc. and Indianz.com Company Exist for the Purpose of Increasing Economic Development for the Winnebago Tribe of Nebraska

The second *Breakthrough* factor considers both "the stated purpose for which the entities were created as well as evidence relating to that purpose." *Williams*, 929 F.3d at 178. Importantly, "[t]he stated purpose need not be purely governmental to weigh in favor of immunity as long as it relates to broader goals of tribal self-governance." *Id.* Every circuit to consider this factor has relied solely on tribal documents to evaluate this question[6]. *Id.; Breakthrough*, 629 F.3d at 1192-93; *Whitaker*, 474 B.R. at 696. Further, the authorities have rejected the notion that courts may probe into either exact percentages of entity revenue that flows back to the tribe or "exacting information about the minutiae of a tribe's budget." *E.g.*, *Williams*, 929 F.3d at 179-80. Both *Breakthrough* and *Williams* relied upon statements of purpose contained in tribal and entity

---

[6] In *White*, the entity in question had a non-commercial purpose; and hence the Ninth Circuit did not explore this factor in depth. *White*, 765 F.3d at 1025.

documents, as well as factual information provided by the entity and the tribe. *Breakthrough*, 629 F.3d at 1192-93 (examining the entity's organizing resolution, the operative ordinance, an MOU between tribe and state, and information provided by the tribe's chairman); *Williams*, 929 F.3d at 178-80 (examining the entities articles of incorporation and information provided by the entity in the underlying litigation). *Whitaker* relied simply upon the entity's purpose as stated in the organizing resolution. 474 B.R. at 687.

It is beyond dispute that HCI and its subsidiaries like the Company exist to increase the Winnebago Tribe's economic well-being. The Tribal Resolution responsible for creating HCI provides that the "Tribal Council desires to charter a corporation which is wholly owned by the Winnebago Tribe of Nebraska" for "economic or political purposes." Snowball Decl. at Ex. 4. Further, as both HCI and the Company are organized under Tribal law and owned by the Tribe, they are subject to Title 11, Article 10 of the Winnebago Corporations Code, which mandates a tribal corporation's net income to be distributed to the Tribe. Tribal Corporation Code. § 11-1030(2). Pursuant to existing federal authority, this textual evidence is sufficient, on its own, to demonstrate that HCI was created for the purpose of economic development.

Nevertheless, voluminous evidence exists that demonstrates that HCI and its subsidiaries were created to generate economic development opportunities for the Tribe. HCI's well-publicized "ongoing mission is to use the Tribe's various economic and legal advantages to develop and operate successful business enterprises and provide job opportunities for Tribal members." Morgan Decl. at ¶ 17. Further, "the long-term mission of Ho-Chunk, Inc. is to provide the tribe with a large enough income stream from its business operations to enable the Tribe to reach economic self-sufficiency." Morgan Decl. at ¶ 18. HCI's net income is comprised of the net income of its subsidiaries like the Company. *Id.* Every year, HCI distributes millions of dollars

of profit from its various subsidiaries, including the Company, back to the Tribe for both governmental and social programs. Snowball Decl. at Ex. 5  Further, HCI and its subsidiaries provide 142 on-reservation jobs, and over 1000 jobs globally. Snowball Decl. at Ex. 5.  The evidence clearly demonstrates that HCI and its subsidiaries provide invaluable economic development to the Tribe.  This factor plainly weighs in favor of immunity.

### iii.  Ho-Chunk, Inc. and the Indianz.com Company Are Controlled by the Winnebago Tribe of Nebraska

Courts also examine the "structure, ownership, and management of entities, including the amount of control the tribe has over the entities" to determine whether the entity constitutes an arm of the tribe. *Williams*, 929 F.3d at 182 (internal quotation marks omitted). Relevant considerations include "the entities' formal governance structure, the extent to which the entities are owned by the tribe, and the day-to-day management of the entities." *Id.*  The circuit courts that have evaluated arm-of-the-tribe immunity have found a wide variety of organizational structures to weigh in favor of immunity under this factor.[7]  In *Breakthrough*, the Tenth Circuit examined two entities: a gaming authority whose board of directors was identical to the tribal council and a casino board that was comprised of 15 directors, only two of whom were not tribal members and none of whom were elected tribal officials.  629 F.3d at 1194-95.  Importantly, the court held both entities were sufficiently linked in structure, ownership, and management to weigh in favor of immunity.  *Id.*  In *White*, the Ninth Circuit held that this factor weighed in favor of immunity where the board was "comprised solely of tribal members . . . appointed by each tribe" with no elected tribal officials.  *White*, 765 F.3d at 1025.  In *Williams*, the Fourth Circuit held that an LLC managed by two tribal council members appointed by majority vote of the tribal council and removed the

---

[7] The Eighth Circuit in *Whitaker* did not directly address this factor.  *See*, *Whitaker*, 474 B.R at 696-97.

same way was sufficiently owned, controlled, and managed by the tribe. *Williams*, 929 F.3d at 182.

In the instant matter, HCI and the Company are indisputably owned, managed, and controlled by the Winnebago Tribe of Nebraska. HCI's formal governance structure consists of a Board of Directors, which consists of "five members, selected by the Winnebago Tribal Council" which shall include "two members [who] shall be current members of the Winnebago Tribal Council"; "one member [who] shall be a member of the Tribe, not a member of the Winnebago Tribal Council"; and "two members [who] shall be persons experienced in business and need not be members of the tribe." Morgan Decl. at ¶ 7. This Board of Directors has "all powers necessary to carry out the purposes of the corporation and shall have control and management of the business and activities of the corporation," however the Tribal Council exercises ultimate authority by virtue of its exclusive power to both appoint and terminate board members and management for any reason. Morgan Decl. at Ex. 1. All shares are issued to and held by the Winnebago Tribe of Nebraska, and "voted by the Tribal Council pursuant to Section 11-1021 of the Winnebago Tribe of Nebraska Business Corporation Code." *Id*. The Board of Directors has delegated day-to-day management authority to corporate officers. *Id.* At the time of this litigation, two of HCI's four top executives, including its President and CEO are enrolled members of the Winnebago Tribe of Nebraska. Morgan Decl. at ¶¶ 2-4. HCI's five-member board is totally comprised of enrolled Tribal members, two of whom are elected members of the Winnebago Tribal Council. *Id* at ¶ 5. The Company has a three-member board of directors., Lance Morgan, Chairperson; Annette Hamilton, Vice-Chairperson; and Angel Derochie, Secretary. Morgan Decl. at ¶ 11. The Tribe via HCI maintains ultimate authority over the composition of this board. Based on the pervasive

involvement by tribal members and tribal leadership in the management structure, day-to-day control, and ownership of HCI, the Winnebago Tribe clearly controls HCI.

### iv. The Winnebago Tribe of Nebraska Explicitly Shared Its Sovereign Immunity with Ho-Chunk, Inc. and Indianz.com Company

The fourth factor "assesses the tribe's intent to extend its immunity to the entities." *Williams*, 929 F.3d at 184. Evidence supporting this factor may be explicitly included in the organizing articles of an entity or in a tribal ordinance. *See, Breakthrough*, 629 F.3d at 1193-94 (examining the operative tribal ordinance governing the entity); *Whitaker*, 474 B.R. at 696 (examining the entity's articles of incorporation); *Williams*, 929 F.3d at 184 (noting that articles of incorporation and governing ordinances are sufficient to meet this factor).[8]  Such is the case here. HCI's and the Company's Articles of Incorporation and the Winnebago Tribe of Nebraska Business Corporation Code explicitly state that Tribal corporations like HCI possess "[a]ll of the rights, privileges and immunities of the Tribe concerning federal, state, or local taxes, regulations, and jurisdiction" that the Winnebago Tribe of Nebraska possesses."  Snowball Decl. at Ex. At ¶. 5; Morgan Decl. at Exs. 1 and 3.  HCI's Articles of Incorporation are likewise explicit: "[T]he Winnebago Tribe of Nebraska hereby confers on the corporation sovereign immunity from suit to the same extent that the Tribe would have such sovereign immunity if it engaged in the activities undertaken by the corporation."  Morgan Decl. at Ex. 1.  The Company's Articles of Incorporation are also explicit: "[T]he Winnebago Tribe of Nebraska hereby confers on the corporation all of the Tribe's rights, privileges and immunities concerning federal, state, and local taxes, regulation, and jurisdiction, to the same extent that the Tribe would have such rights, privileges, and immunities, if it engaged in the activities undertaken by the corporation."  *Id* at Ex. 3.  These clear, repeated

---

[8] The Eighth Circuit in *Whitaker* did not directly address this factor.  *See*, *Whitaker*, 474 B.R at 696-97.

assertions that HCI and the Company share the Tribe's sovereign immunity are dispositive in favor of the tribal entities on this factor.

### v. Ho-Chunk, Inc. and Indianz.com Company Provide Invaluable Financial Support to the Winnebago Tribe of Nebraska

The final *Breakthrough* factor for purposes of the Ninth Circuit test "considers the financial relationship between the tribe and the entities." *Williams*, 929 F.3d at 184. The key consideration under this factor is "the extent to which a tribe depends on the entity for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities." *Williams*, 929 F.3d at 184 (internal quotations and modifications omitted). Thus, "[i]f a judgment against the entity would significantly impact the tribal treasury, this factor will weigh in favor of immunity even if the tribe's liability for an entity's actions is formally limited." *Id.* Neither *Whitaker* nor *White* directly addressed this question. *See*, *Whitaker*, 474 B.R. at 697; *White*, 765 F.3d at 1025. It is not clear what kind of evidence the Fourth Circuit relied on to conclude that this factor weighed in favor of immunity in *Williams*, but the Fourth Circuit rejected the notion that the entity must prove a judgment would have a ***substantial*** impact upon the tribe's treasury. *Williams*, 929 F.3d at 184. Significantly, the Tenth Circuit in *Breakthrough* held that this factor weighed in favor of immunity based upon the tribal chairman's testimony that "***any reduction in the [entity's] revenue that could result from an adverse judgment against it would . . . reduce the [t]ribe's income***." *Breakthrough*, 629 F.3d at 1195 (emphasis added).

In the present case, HCI is the foremost economic engine for the Winnebago Tribe of Nebraska. Importantly, HCI generates revenue through its subsidiaries, like the Company. Morgan Decl. at ¶ 18. As discussed in Part I(2)(ii) *supra*, the Tribe has seen massive socio-economic improvement because of HCI. Because of the economic development created by HCI

and its subsidiaries, the Winnebago Reservation reports a 36% increase in labor force participation, and a median household income increase of $20,329, or 83%, between 2000 and 2016. Snowball Decl. at Ex. 5. Winnebago Public School District has seen 43% enrollment increases since 2001, and the number of adult community members with at least a bachelor's degree has increased 70% since 2011. *Id.* In 2018, HCI produced $259 million in revenue, which went into the initiatives, projects, and community needs previously described. *Id.* at 26. One additional example is HCI's policy of matching "employee donations up to $25,000 annually" for the HCI donation program, Ho-Chunk Way, which included $47,795 in donations for the Winnebago Senior Citizens Center. *Id.* at 17. These donations helped the Center fix its wheelchair lift and purchase new meal delivery vehicle, among other improvements. HCI is clearly invested in supporting the Tribe, and the Tribe has clearly blossomed into a regional economic powerhouse because of it. As set forth in the declaration of John Snowball, any reduction in HCI's revenue that could result from an adverse judgment against it would reduce the tribe's income and, as such, this factor plainly weighs in favor of immunity. Snowball Decl. at ¶ 19; *See Breakthrough*, 629 F.3d at 1195.

As set forth in detail above, regardless of where this Court imposes the burden of proof, there is no question that HCI and the Company have met and exceeded the standard of evidentiary proof required to demonstrate that they are arms of the Winnebago Tribe of Nebraska such that this Court lacks jurisdiction to hear Dossett's claims. Consequently, his suit against the tribal entities must be dismissed in their entirety under Rule 12(b)(1).

II.     **Dossett's Defamation Claim and Intentional Interference with Economic Relations Claims Must be Struck Pursuant to Oregon's Anti-SLAPP Statute and Fed.R. Civ. P. 8 and 12(b)(6) Standards**

1. **Legal Standard: The Anti-SLAPP Statute Applies to Both the Defamation and the Intentional Interference with Economic Relations Claims**

### a. Oregon's Anti-SLAPP Statute Provides Broad Protections for First Amendment Activity

Oregon's anti-SLAPP statute "provide[s] for the dismissal of claims against persons participating in public issues, when those claims would be privileged under case law, before the defendant is subject to substantial expenses in defending against them." *Staten v. Steel,* 222 Or. App. 17, 29 (2008), *rev. denied*, 345 Or. 618 (2009). Motions to strike pursuant to state anti-SLAPP statutes are appropriately heard in federal court. *See, e.g. Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001).[9] Anti-SLAPP challenges that challenge the legal sufficiency of a claim are properly brought under Rule 12(b)(6). *See Planned Parenthood Fed'n of America, Inc. v. Ctr. for Medical Progress*, 890 F.3d 828 (2018); *see also Miller v. Watson*, No. 3:18-cv-00562-SB, 2019 WL 1871011 (D. Or. Feb. 12, 2019) (Beckerman, Mag.) ), *aff'd Miller v. Watson*, No. 3:18-cv-00562-SB (D. OR. Apr. 25, 2019).

The Oregon anti-SLAPP statute, O.R.S. § 31.150, sets forth a two-step burden shifting process. The defendant bears the initial burden to show that the claim arises from a protected activity. Once that burden has been met, the burden shifts to the plaintiff to demonstrate "that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case." *Young v. Davis*, 259 Or. App. 497, 501 (2013); *see also Gardner v. Martino*, 563 F.3d 981, 986 (9th Cir. 2009) (reviewing an application of the Oregon anti-SLAPP statute).

---

[9] *Wornick* interprets California's Anti-SLAPP statute. Oregon courts have "expressly recognized that Oregon's anti-SLAPP statute was 'modeled on California statutes,' citing the legislative history of O.R.S § 31.150 to 31.155 in stating that '[i]t was intended that California case law would inform Oregon courts regarding the application of ORS 31.150 to ORS 31.155.'" *Young*, 259 Or. App. 497, 507 (2013) (quoting *Page v. Parsons,* 249 Or.App. 445, 461, 277 P.3d 609 (2012)).

Evidence favorable to the plaintiff is accepted as true. *Mullen v. Meredith Corp.*, 271 Or. App. 698, 708 (2015) Defendant's opposing evidence is considered "to determine if it defeats plaintiff['s] showing as a matter of law." *Id.* (internal citation and quotations omitted); *see also Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 887 (9th Cir. 2016).

### b. HCI and the Company Satisfy the First Step in the Anti-SLAPP Analysis for Both Causes of Action

The defendant bears the "initial burden to show that the claim against which the motion is made arises out of one or more protected activities." *Young*, 259 Or. App. at 501. Any "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest" is a key trigger for application of Oregon's anti-SLAPP statute. O.R.S. § 31.150(2)(d). The articles published on Indianz.com upon which Dossett has based his defamation and intentional interference with economic relations claims are clearly contemplated by the statute. "To prevail on an anti-SLAPP motion, the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." *Manzari*, 830 F.3d at 887. Articles published online by news organizations on topics of public interest "easily satisfy [the] initial burden." *Id.* at 887. Furthermore, documents containing the "findings of an investigation into the alleged misconduct of a public official" have previously been held to be a matter of public interest sufficient to trigger Or. Rev. Stat. § 31.150(2)(d). *Miller*, 2019 WL 1871011, at *5 (citing *Plotkin v. State Accident Ins. Fund*, 280 Or. App. 812 (2016)). Dossett is not a public official, but he is a public figure for purposes of defamation analysis.

Significantly, news outlets and their owners are precisely the parties that anti-SLAPP statutes are designed to protect. The website Indianz.com is a news website that publishes articles on topics that matter to the global Native American community. The integrity of a man who acted

as the top attorney for the oldest and largest Native American policy and lobbying organization is very much a matter of public interest for the Native American community. Indianz.com published news articles based on credible sources that discussed the long-standing negative atmosphere at NCAI for women, including specific instances Indianz.com was told about that related to Dossett. ECF 1-1, 1-5. These news articles clearly meet the burden of qualifying for anti-SLAPP protection under O.R.S. § 31.150(2)(d).

## 2. DOSSETT CANNOT ESTABLISH A PROBABILITY OF PREVAILING ON THE DEFAMATION CLAIMS

### a. The Allegedly Defamatory Content Is Either Protected or Privileged Speech

Dossett alleges that two articles published by Indianz.com defamed him: (1) "Prominent Indian Country attorney reassigned after #MeToo allegations" ("August 31st Article"); and (2)"National Congress of American Indians opens annual convention amid controversy" ("October 23rd Article"). ECF 1-1, 1-5. His allegations fail for two fundamental reasons. First, Dossett is a public figure and therefore must meet the "actual malice" intent standard, which is not demonstrated here. Second, the content of the allegedly defamatory articles that Dossett takes issue with is opinion, and subsequently protected by the First Amendment.

### b. Dossett Is a Public Figure

Dossett readily concedes his status as a public figure, describing himself as "a leader in the field of Indian law," ECF 1 at ¶ 2, and "a nationally recognized expert in tribal sovereignty and jurisdiction, tribal lands and natural resources, taxation, and public safety in Indian country [sic]," ECF at ¶ 15. Dossett was also the general counsel of NCAI for 23 years. *Id*. NCAI, which was established in 1944, "is the oldest and largest national organization of American Indian and Alaska Native tribal governments, and includes among its members most of the major tribes of the United States." *Cobell v Norton*, 283 F. Supp. 2d 66, 256 (D. D.C. 2003). During his long tenure at

NCAI, Dossett was admittedly at the center of Indian Country's most important and controversial movements. ECF 1 at ¶ 15. The harm that Dossett alleges in this lawsuit is, unsurprisingly, loss of other public and high-profile opportunities, including professorships at Lewis and Clark Law School and Cornell Law School, and various speaking engagements. *Id.* at ¶¶ 17, 45.

"Whether an individual is a public figure is a question of law that must be assessed through the totality of the circumstances." *Manzari*, 830 F.3d at 888. While some individuals are public figures in all contexts, most are simply "public figure[s] for a limited range of issues." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974) (internal quotation marks omitted). The Ninth Circuit has held, moreover, that it is not significant that an individual is not a public figure in the American mainstream. *Manzari*¸830 F.3d at 888. In *Manzari* a self-promoting, online soft-core pornographer could not avoid public figure status, despite the fact that she was not "household name" in the mainstream entertainment industry. *Id.* It was enough that she was prominent in her small segment in the world. *Id.* Bizarrely, the Ninth Circuit addressed relative public figure status in a different pornography context in *Leidholdt v. L.F.P. Inc.*, in which it held that an otherwise private person who had become a leader in an anti-pornography movement, had given public speeches on the issue, and had otherwise participated in the movement on a national level constituted a public figure. 860 F.2d 890, 892 (9th Cir. 1988). Other courts have recognized that political activists and personnel of a national ethnic group advocacy organization are public figures. *See Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018); *Parsi v. Daioleslam*, 595 F. Supp. 2d 99 (D.D.C. 2009).

In both the Ninth Circuit authorities and the out-of-circuit authorities, plaintiffs – like Dossett – conceded their public figure status in the operative complaints. *See*, *Leidholdt*, 860 F.3d

at 892; *Manzari*, 830 F.3d at 888; *Parsi*, 595 F.Supp.2d at 102; *Fairbanks*, 314 F.Supp.3d at 87.

John Dossett is a public figure.

### c. *Oregon's Standard for Defamation Claims*

Dossett must demonstrate by substantial evidence that there is a probability of success in his defamation claims in order to defeat this motion to strike. Under Oregon law, "[t]o establish a claim for defamation, a plaintiff must show that a defendant made a defamatory statement about the plaintiff and published the statement to a third party." *Neumann v. Liles,* 369 P.3d 1117, 1121 (Or. 2016). Statements concerning a person's profession are defamatory "if [they] falsely ascribe to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, or profession." *Id.* (internal quotations omitted). "Statements falsely alleging facts that are likely to lead people to question a plaintiff's fitness to perform his job are defamatory *per se*." *Elizabeth Retail Props. LLC v. KeyBank Nat'l Ass'n*, 83 F. Supp. 972, 993 (D. Or. 2015) (quotation marks and citations omitted).

### d. *Dossett's Claims Are Legally Insufficient to Prove Actual Malice*

The U.S. Supreme Court has held that a public figure is prohibited "from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964). A public figure cannot prove actual malice arising from defamation unless he can show that "the publication contains a false statement of fact which was made . . . with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988). Actual malice "requires at a minimum that the statements were made with a reckless disregard for the truth." *Id.* at 667. While the Supreme Court has

emphasized "reckless disregard" has no single definition, the Court does require proof that the defendant either (1) "***made the false publication with a 'high degree of awareness of probable falsity***[;]'" or (2) "'***entertained serious doubts as to the truth of his publication***.'"  *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 272, 730-31 (1968) and *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)) (emphasis added).

Claims requiring malice are "subject to the plausibility pleading standard" of Federal Rules of Civil Procedure 8(a) in order to survive a motion to dismiss.  *Miller*, 2019 WL 1871011, at *6 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 686-87 (2009)). While the Ninth Circuit has not directly considered the question, courts in this circuit have noted that "the circuits that have considered this question . . . have uniformly held that a claim may be dismissed for failing plausibly to allege actual malice without permitting discovery." *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1027-28 (N.D. Cal. 2017). Moreover, all the circuits who have considered the question have "applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pleaded facts sufficient to give rise to a reasonable inference of actual malice." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

Dossett fails to provide an any evidence that HCI and the Company acted maliciously or with reckless disregard for the truth or falsity of the information by publishing the two articles at issue.  ECF 1 at ¶¶ 54-61; 85-90.  Dossett does not allege that the staff of Indianz.com failed in their journalistic duty to verify their sources when possible or to carefully weigh the veracity of their subjects.  *Id.*  The reporters working for Indianz.com had no reason to believe that these events did not occur when they published the article.  Agoyo Decl. at ¶ 5, 7, 9.  All subsequent interpretation by various employees and persons interviewed is opinion, and not subject to being

true or false, and cannot therefore be malicious. *See, e.g., Milkovich v. Lorian Journal Co.*, 497 U.S. 1, 20 (1990); *Reesman v. Highfill*, 327 Or. 597, 606 (1998). The fact that Dossett disagrees with the opinions of his peers does not suddenly attribute to them the qualities of factual allegations.

As Dossset admittedly is a public figure and cannot and does not allege actual malice, his claim must fail and this Court must strike Dossett's claim against HCI on these grounds alone.

### e. Both the articles and comments alleged by Dossett to be defamatory are constitutionally protected speech under the First Amendment

The two articles at issue constitute speech protected by the First Amendment and hence, regardless of actual malice, Dossett cannot prevail. The allegedly defamatory content is almost entirely comprised of Indianz.com's reporting on the opinions of interviewees. Opinion, of course, is a constitutionally protected class of speech. "Whether an allegedly defamatory statement is one of opinion or fact is a question of law." *Gardner*, 563 F.3d at 986. In Oregon, opinion statements relating to issues of public concern, "which cannot be interpreted reasonably as stating actual facts, are not actionable because they are constitutionally protected." *Reesman*, 327 Or. at 606 (citing *Milkovich*, 497 U.S. at 20). Because this analysis revolves around a question of law, the 12(b)(6) standard articulated in *Planned Parenthood Federation of America* applies. 890 F.3d at 834. The Ninth Circuit previously has affirmed that reports that an individual is allegedly a "'sex harasser,' a 'dangerous harasser,' an 'unstable person,' a 'menace,' and 'a danger to other employees' are couched in [the speaker's] own perceptions and therefore [are] opinions rather than statements of fact." *Byrnes v. Lockheed-Martin, Inc.*, No. C-04-03941, 2005 WL 3555701, at *7 (N.D. Cal. Dec. 28, 2005), *aff'd and remanded*, 257 Fed. Appx. 34 (9th Cir. 2007).

The Ninth Circuit applies a three-prong test to determine whether a statement is fact or opinion: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact; (2) whether the defendant used figurative or hyperbolic language that negates that impression; and (3) whether the statement in question is susceptible of being proved true or false." *Gardner*, 563 F.3d at 987. The Court in *Partington v. Bugliosi* added that under this test, the court "examine[s] the work as a whole, the specific context in which the statements were made, and the statements themselves to determine whether a reasonable factfinder could conclude that the statements imply a false assertion of objective fact and therefore fall outside of the protection of the First Amendment." 56 F.3d 1147, 1153 (9th Cir. 1995)

### i. The August 31st Article

Dossett alleges that the August 31st Article is defamatory per se in its entirety because it states that "Mr. Dossett is a 'predator,' and leads readers to believe that he sexually harassed employees." ECF 1 at ¶ 58. Dossett claims that those statements are false and offers nothing further other than the conclusory statement that the article is "defamatory per se" because "it attributes to Mr. Dossett serial sexual misconduct, unfitness for the duties of his profession, moral turpitude, and foreseeably would harm Mr. Dossett's career and livelihood." *Id* at ¶ 59. In addition to failing to support his allegation that the August 31st Article is defamatory per se, Dossett also egregiously mischaracterizes the article by providing selective quotations that rob the article of its context. As set forth in detail below, the August 31st Article is almost entirely comprised on the opinions of interviewees and inferences derived from those opinions.

First, the August 31 Article does not use the terms "serial sexual misconduct" or "predator," yet those terms fairly characterize the opinions presented by Indianz.com's interviewees:

Interviews with former employees show that some at NCAI tried to make the place safer for women, especially the young Native women who typically make up the bulk of the organization's workforce. But repeated attempts to resolve complaints against Dossett went nowhere, documents obtained by Indianz.Com indicate, at least until the internal review this year.

'It's one of the biggest hypocritical things about NCAI,' one former employee said. 'NCAI is the national leader on VAWA issues for Indian Country but they are not even taking care of their own.'

Dossett's treatment of women was common knowledge, according to this former employee. She went to work for NCAI in hopes of making a difference in tribal communities but soon found herself question whether she would be able to do that with a potential predator on the payroll.

'As a new staff [sic], I was told by a colleague, "you are a pretty young Native woman, beware of John Dossett. Don't be caught in a room alone with him," the former employee said, making her one of three former employees interviewed by Indianz.Com who said they were told never to be alone with Dossett.

'It's the worst kept secret in D.C.'s Indian circles,' she said.

ECF 1-1 at p. 3. Read in context, these characterizations are consistent expressions of interviewee

opinions. Such statements, in context, are simply not objective facts nor are they presented as such.

*See*, *Gardner*, 563 F.3d at 987

Shifting to specific disputes, Dossett alleges that the following quotes from the August 31st

Article are "defamatory per se on their face":

a. "The terrible secret was apparently exacerbated by NCAI's documented inability to fully resolve complaints of sexual harassment and other allegations of misconduct"
b. "…repeated attempts to resolve complaints against Dossett went nowhere . . . at least until the internal review this year."
c. "A close examination of NCAI's annual report shows that women are in fact the most affected by the turmoil. Between 2017 and 2018, for example, 58 percent of the employees who left the organization were women."
d. "'That's no excuse,' said Harjo. 'That's no excuse for predatory behavior'"

ECF 1 at ¶ 56. Additionally, Dossett alleges the employee quote stating, "'[y]ou are a pretty young

Native woman, beware,'" is defamatory per se because it "lead[s] readers to believe that Mr.

Dossett is engaged in serial sexual harassment." *Id*. at ¶ 57.

The two statements concerning NCAI's inaction regarding sexual harassment complaints constitute former and current NCAI employees' opinions and reporter interpretation of those opinions. *See*, *id*; Agoyo Decl. at ¶ 5. This discussion exists in the context of an alleged systemic failure by NCAI to respond to sexual harassment complaints at all, and to the allegedly toxic culture there, as indicated by following article excerpt:

> Harjo also said NCAI's handling of misconduct allegations has fostered a climate of shame, silence and intimidation among those who have worked there. She believes a closer examination of the organization's management could reveal problems with the way employees have been treated. 'It's never just one guy – it's a whole context, a whole setting.' . . . 'One guy has enablers, one guy has people who look the other way, and one guy depends on a lot of people who aren't going to say anything because they are embarrassed or they are fearful.'

ECF 1-1 at p. 6.

The article is clear. Suzan Harjo, a former NCAI Executive Director, expressed her opinion concerning the entire controversy; the former employee expressed an opinion relating to employee safety around Dossett. ECF 1-1 at p. 2-3 and 6. None of these statements remotely asserts an objective fact and all clearly are couched in the context of the speaker's opinion. *Gardner*, 563 F.3d at 987; *Byrnes*, 2005 WL 3555701, at *7. For these reasons, Count One of Dossett's Complaint does not constitute defamation and must fail as a matter of law.

### ii.  The October 23rd Article

Dossett alleges that the second article is defamatory because it contained a lengthy quotation of a "public statement" that NCAI President Jefferson Keel presented at NCAI's Annual Meeting as follows:

> President Jefferson Keel directly addressed the controversy that arose after Indianz.com began reporting on the issue almost two months ago. He acknowledged almost immediately the turmoil that has eroded confidence in the nation's oldest and largest inter-tribal organization:

"As you know, NCAI has been in the news lately and it's not for the best reasons," Keel told fellow tribal leaders not long after opening the 75th annual convention at a hotel in downtown Denver.

But Keel insisted that NCAI took action to address allegations of staff misconduct long before Indianz.com's first report on August 31, which detailed the existence of a #MeToo investigation involving John Dossett, who was reassigned and then eventually ousted from his role as the organization's longest-serving and highest-ranking attorney.

"NCAI doesn't condone harassment of any kind in the workplace, nor have we, nor will we, tolerate it anymore," Keel said. "We will take action when it occurs in the future just like we did in the situation at hand.

ECF 1 at ¶ 86. Dossett alleges that excerpt is defamatory per se "because it was in reference to the demotion and firing of Mr. Dossett and falsely states that sexual harassment occurred the situation at hand," "contrary to NCAI's own internal investigations," and because he was actually "demoted for non-sexual harassment grounds and due to office politics." *Id.* at ¶ 87.

Significantly, President Keel's quote is protected by the neutral reportage privilege, which protects reporting on public statements. "When a responsible, prominent organization . . . makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity. "*Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 120 (2d Cir. 1977); *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1123 (N.D. Cal. 1984). The privilege protects "the public interest in being fully informed about controversies that rage around sensitive issues" which demand "that the press be afforded freedom to report such charges without assuming responsibility for them. *Barry*, 584 F. Supp 1124. (citation omitted).

The neutral reportage doctrine has been adopted by at least one jurisdiction in this Circuit, the Northern District of California, as well as the Second and Eighth Circuits. *See Barry* 584 F. Supp 1110 (N.D. Cal. 1984); *Edwards*, 556 F.2d 113, *cert. denied sub nom. Edwards v. New York*

*Times Co.*, 434 U.S. 1002 (1977); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989);

*see also Coliniatis v. Dimas*, 965 F. Supp. 511 (S.D. N.Y. 1997); *Sunshine Sportswear & Electronics, Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499 (D.S.C. 1989).

President Jefferson Keel's speech at the 2018 Annual Meeting constituted the statement of a prominent organization on this controversy such that Indianz.com's reporting on the same falls squarely within the privilege. For this reason and because the reporting represented Mr. Keel's opinion, Dossett's Count Five fails as a matter of law.

### f. The Remainder of the Allegedly Defamatory Comments Are True

Perhaps the most perplexing of Dossett's allegations is his characterization of the following Indianz.com quote as defamatory:

> "In the document, Dossett said he 'never harassed' the employee, though he admits he 'totally restrained' her by the arm during the incident in question. He also said he 'held' the woman's hand in what he characterized as an attempt to assist her after a long day of work at the 'end of a big meeting.' Even as he offered an apology for his behaviors, he suggested that he had justification to act in that manner. He said he was concerned about the employee's well-being, saying that she was 'really tired' and was affected by 'maybe too many beers.'" "A close examination of NCAI's annual reports show that women are in fact the most affected by the turmoil. Between 2017 and 2018, for example, 58 percent of the employees who left the organization were women."

ECF 1, ¶ 87(c). This quote simply describes Dossett's own retelling of the incident in an email obtained by Indianz.com. ECF 1-1 at p. 5. The quote likewise closely mirrors Dossett's narrative in the instant Complaint: "[A] female colleague had too much to drink during dinner and fell asleep at the table. She was having trouble walking, so Mr. Dossett helped guide her two blocks to the hotel lobby nearby. . .." ECF 1, ¶ 21. The narratives are factually identical because they are both Dossett's. Dossett physically led an intoxicated female employee back to the hotel where she was staying. As a result, this statement cannot defame Dossett as a matter of law as he has conceded

its truth. *See, e.g., Bank of Or. v. Indep. News, Inc.*, 298 Or. 434, 437 (1985) (rendering "true" utterances unavailable for defamation claims).

### 3. Dossett Cannot Establish a Probability of Prevailing on the Intentional Interference with Economic Relations Claim

#### a. *Dossett's Allegations Are Insufficient to Make a Prima Facie Case*

*McGanty v. Staudenraus* articulates Oregon's test of intentional interference with economic relations ("IIER") in Oregon. 901 P.2d 841 (Or. 1995). IIER claims trigger the anti-SLAPP statute. *See Plotkin v. State Accident Ins. Fund*, 385 P.3d 1167 (Or. App. 2016). In order to succeed on an IIER claim, each of the six following factors must be alleged:

> (1) the existence of a professional or business relationship (which would include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

*McGanty*, 901 P.2d at 844. IIER arises when "interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself[, including] . . . improper motives or from the use of improper means." *Sanford v. Hampton Res., Inc.*, 298 Or. App. 555, 562-63 (2019) (internal quotation marks and citations omitted). For a purpose to be improper, the purpose "must be to inflict injury on the plaintiff." *Northwest Nat. Gas Co. v. Chase Gardens, Inc.*, 982 P.2d 1117, 1124 (Or. 1999). Means are improper when they "violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law. . .." *Grimstaud v. Knudsen*, 386 P.3d 649, 665 (Or. App. 2016). "Examples of improper means include violence, threats, or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Id*. (internal quotations omitted).

To survive a challenge to the legal sufficiency of an anti-SLAPP claim, a claim must survive 12(b)(6) analysis. A complaint "must contain sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Further, in order for Dossett's IIER claim to meet the minimum pleading standards required for such a claim, Dossett's defamation claim must not only survive this Motion to Strike but also succeed on the merits. If a "claim of tortious interference with business relationships is brought as a result of constitutionally-protected speech, the claim is subject to the same First Amendment requirements that govern actions for defamation." *Gardner*, 563 F.3d at 992 (citing *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990)).

Dossett failed to plead IIER with sufficient particularity. Although Dossett realleges all preceding allegations, his actual IIED claim is comprised of just six numbered items, including the reassertion. ECF 1 at ¶¶ 102-07. Dossett alleges that he had professional relationships with his two former employers, NCAI and Lewis & Clark Law School, as well as with Cornell Law School, and "other academic institutions, and with potential future employers." ECF 1 at ¶¶ 103. The Complaint then makes broad comments about "intentional interference" that do not clearly demarcate the separate defendants:

> [d]efendants intentionally interfered with those [professional] relationships by knowingly making false statements about Plaintiff, maliciously sharing false rumors with colleagues among the NCAI Staff and with Indianz.com, and knowingly published unsubstantiated false allegations with reckless disregard for the truth, resulting in Plaintiff's loss of employment with NCAI, loss of employment as an adjunct professor with Lewis & Clark Law School, a ruined reputation and loss of future opportunities for employment.

*Id*. at ¶ 104. To Dossett's credit, this threadbare paragraph asserts the first IIED factor— that business relationships exist between him and three entities: NCAI, Lewis & Clark Law School,

and Cornell Law School. *Id*. 1 at ¶ 103. Beyond that, Dossett does not clearly allege any other factor. Specifically, he does not demonstrate how HCI or the Company intentionally interfered with those relationships—which would require evidence of improper means or improper purpose—because no specific action is tied to HCI or Indianz.com. *Id.* This failure is not rectified in the subsequent paragraph, which states generically that "[d]efendants accomplished the interference through improper means or for an improper purpose." *Id.* at ¶105.

Dossett's re-allegation of defamation facts and argument does not cure the defect, as Dossett never alleged any facts or law that demonstrate "actual malice" or any improper conduct on the part of Indianz.com. *See* Part II(2) *supra*. As a result, even notwithstanding the anti-SLAPP statute, his claim fails. Likewise, the threadbare allegations of Dossett's Complaint fundamentally fail to meet the stringent standards for demonstrating plausibility of his IIER claim and so it must fail.

## CONCLUSION

Based on the foregoing, HCI respectfully requests that this Court dismiss Dossett's claims against HCI in their entirety.

Dated: November 4, 2019

By:    s/ *Nicole E. Ducheneaux*
    Nicole E. Ducheneaux, *Pro Hac Vice*
    Big Fire Law & Policy Group LLP
    1404 Fort Crook Road South
    Bellevue, NE 68005
    Telephone: (531) 466-8725
    Facsimile: (531) 466-8792
    .Email: nducheneaux@bigfirelaw.com

By:    s/ *Anthony Broadman*
    Anthony Broadman, Bar No. 112417
    Galanda Broadman PLLC
    8606 35th Avenue NE, Ste. L1
    Seattle, WA 98115
    Telephone: (206) 321-2672
    Fascimile: (206) 299- 7690
    Email: anthony@galandabroadman.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Nicole E. Ducheneaux*